51 N.J. Super. 520 (1958)
144 A.2d 279
PAUL KOTLARICH AND JENNIE KOTLARICH, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
THE MAYOR AND COUNCIL OF THE BOROUGH OF RAMSEY, A MUNICIPAL CORPORATION IN THE COUNTY OF BERGEN AND STATE OF NEW JERSEY, AND PLANNING BOARD OF THE BOROUGH OF RAMSEY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 1958.
Decided August 1, 1958.
*525 Before Judges STANTON, HALL and GAULKIN.
Mr. Albert S. Gross argued the cause for respondent (Messrs. Gross & Gross, attorneys; Mr. Nelson S. Gross, of counsel).
Mr. James M. Muth argued the cause for appellants.
The opinion of the court was delivered by HALL, J.A.D.
This is an appeal by the planning board and the mayor and council of the Borough of Ramsey from a judgment of the Law Division setting aside a resolution *526 of the planning board classifying a proposed subdivision of plaintiffs' lands as a "major" and not a "minor" subdivision and "disapproving" it, directing the mayor and council to approve it as a "minor" subdivision, and dismissing a counterclaim asserted by the governing body for injunctive relief against alleged interference by plaintiffs with a drainage easement held by the municipality over the lands.
Since our view of the case involves administrative procedural considerations under certain aspects of the Municipal Planning Act (1953) (L. 1953, c. 433; N.J.S.A. 40:55-1.1 et seq.) not previously considered by our appellate courts, we think it advisable first to sketch the pertinent provisions of the act and of the land subdivision ordinance of the borough adopted pursuant to the authority thereof, the latter of a type in common use in this State today.
One of the powers granted to municipalities by this statute is authority to regulate the subdivision of land (N.J.S.A. 40:55-1.14), which is defined as "the division of a lot, tract, or parcel of land into two or more lots, sites or other divisions of land for the purpose, whether immediate or future, of sale or building development * * *," with certan non-pertinent exceptions (N.J.S.A. 40:55-1.2). Such regulation is, like zoning, another tool for planning. Cf. Kozesnik v. Montgomery Township, 24 N.J. 154 (1957); Cunningham, "Real Property," 12 Rutgers L. Rev. 218, 249 (1957). It is not mandatory but permissive, exercisable by municipal ordinance. The basic method of such regulation is "by requiring the approval of the governing body, by resolution, of all plats [the map of a subdivision] after favorable referral by the planning board before such plats may be filed with the county recording officer * * *." (N.J.S.A. 40:55-1.14). Lake Intervale Homes, Inc. v. Parsippany-Troy Hills Township, 47 N.J. Super. 334, 349 (Law Div. 1957). Alternatively, the same section permits such approval to be exercised by the planning board alone, acting in lieu of the governing body, if provision to that effect is made in the ordinance creating the planning board. If no such provision is made, the planning board acts merely *527 as an initial reviewing and reporting agency to the governing body (except as hereinafter noted) "in accordance with regulations, requirements and standards established by the governing body" in the ordinance (N.J.S.A. 40:55-1.14). Ramsey adopted the first of the two alternatives, its subdivision ordinance stating: "The approval provisions of this ordinance shall be administered by the governing body after favorable referral by the Ramsey Planning Board * * *." The latter is, consequently, what has come to be called a "weak" planning board, as distinct from one given full approving powers commonly known as a "strong" planning board.
The mechanics of approval of a subdivision provided by the statute and carried into the ordinance, broadly speaking, provide for three steps. The first one derives from another permissive provision of the act stating that any subdivision ordinance
"may exempt from the requirement of local municipal approval, subdivisions wherein the number of new lots is less than a designated number, or plats that do not involve new streets, or such other classes of subdivisions as such ordinance shall designate. In all cases involving such exempted subdivisions, the mayor or planning board chairman, as the case may be [depending on whether the planning board is a "weak" or "strong" one], and the municipal clerk shall certify the exemption on the plat, deed, or instrument to be filed with the county recording officer." (N.J.S.A. 40:55-1.14) (Emphasis ours throughout).
Where an ordinance provides for such exemption the first step, therefore, involves the classification of the proposed subdivision as exempt or non-exempt. If found to be exempt, approval, in the sense of affirmative action by the governing body as distinct from the mere ministerial certification by the mayor, is unnecessary. If found not to be exempt, the next steps come into play. Again broadly speaking, they are, in most instances, "tentative" approval (N.J.S.A. 40:55-1.18) based on a preliminary plat and, ultimately, final approval. We are not involved in this case with the latter two steps and are not called upon to comment on the statutory and ordinance provisions relating thereto.
*528 Ramsey's ordinance does purport to provide for "exemption" of certain kinds of subdivisions by use of terms which, though somewhat confusing in the light of the statutory language, have become very common in such ordinances, i.e., classification as a "minor subdivision" or a "major subdivision." The term "exempt" is not used in this ordinance, but we think the classification must find its origin and, therefore, its incidents in the statutory exemption provision. "Minor subdivision" is defined as: "Any subdivision containing not more than four lots fronting on an existing street, not involving any new street or road or the extension of municipal facilities and not adversely affecting the development of the remainder of the parcel or adjoining property and not in conflict with any provision or portion of the master plan, official map, zoning ordinance or this ordinance." "Major subdivision" is defined as: "All subdivisions not classified as minor subdivisions."
The statute further requires that the local ordinance must contain standards "for approving the design of subdivisions and the required street improvements, requirements for the submission of subdivision plats, and the procedure to be followed by subdividers." (N.J.S.A. 40:55-1.15). In addition, certain compulsory standards are imposed on the board by N.J.S.A. 40:55-1.20 in acting on all plats, i.e., whether it is a matter of exemption or, if non-exempt, of approval in the case of a "strong" board or favorable referral to the governing body in the case of a "weak" board. This section specifies that the board
"shall require, among other conditions in the public interest, that the tract shall be adequately drained, and the street shall be of sufficient width and suitable grade and suitably located to accommodate the prospective traffic, to provide access for fire-fighting equipment to buildings and to be co-ordinated so as to compose a convenient system, * * *."
and
"that all lots shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace." *529 Further in this regard, the Ramsey ordinance, in the section devoted to design standards of lots, specifies, inter alia:
"Where there is a question as to the suitability of a lot or lots for their intended use due to factors such as rock formations, adverse soil, flood conditions or similar circumstances, the planning board may, after adequate investigation, withhold approval of such lots."
The governing body (not the planning board even in the case of a "strong" board) may also require, before final approval of plats, "in accordance with the standards adopted by ordinance, the installation, or the furnishing of a performance guarantee in lieu thereof," of such improvements as it may deem to be necessary or appropriate in the public interest. N.J.S.A. 40:55-1.21. (Ramsey specifies in advance its requirements for such improvements by detailing them in the ordinance.) Obviously this section can have no application where the subdivision is found to be an exempt one not requiring any further approval.
The procedural pattern prescribed by the Ramsey ordinance, in purporting to follow the authority of the enabling act, provides initially, in the case of all proposed subdivisions, for the submission of a "sketch plat," "for purposes of classification and preliminary discussion" to be filed with the borough clerk and submitted by the latter to the planning board for consideration. The ordinance directs that the chairman of the board shall appoint a "subdivision committee" of three members to "classify subdivisions in accordance with the provisions of this ordinance," meaning classification as between "major" and "minor." If the committee unanimously classifies the proposal as minor, it shall place a notation to that effect on the sketch plat and file the same together with a written report of its action with the governing body, and the plat shall then be turned over to the mayor and clerk for certification and the original plat returned to the subdivider within one week following the next regular meeting of the governing body. "If the plat is classified and approved as a minor subdivision, but is not *530 approved by unanimous action of the committee, then the plat shall be referred to the Planning Board with the written report of the committee for further action," and if the board "also classifies and approves the plat as a minor subdivision," the same procedure is to be followed as in case of unanimous action by the committee. (Note the presence in the case of non-unanimous committee action of a requirement not only of classification but also of approval  by which we assume is meant a finding of conformity with the various substantive standards and requirements of the statute and ordinance as heretofore referred to  and the omission of any requirement of approval where the committee acted unanimously. The omission in the latter case would appear to be inadvertent rather than deliberate.) The same section of the ordinance further provides that if a plat is classified as a major subdivision, i.e., is not found to be exempt from further approval, notation to that effect shall be made on it and the plat returned to the subdivider for compliance with the further procedure of the ordinance relative to tentative and final approval of major subdivisions.
One other provision of the statute is of decisive importance in the instant case. It is found in N.J.S.A. 40:55-1.19 and we quote it in full:
"If any person shall be aggrieved by the action of the planning board, appeal in writing to the governing body may be taken within ten days after the date of the action of the planning board. A hearing thereon shall be had on notice to all parties in interest, who shall be afforded an opportunity to be heard. After such hearing the governing body may affirm or reverse the action of the planning board by a recorded vote of a majority of the total members thereof. The findings and reasons for the disposition of the appeal shall be stated on the records of the governing body, and the applying party shall be given a copy.
Nothing in this act shall be construed to restrict the right of any party to obtain a review by any court of competent jurisdiction according to law."
It should be noted that in the Ramsey ordinance this language of the statute is incorporated, but only as a subheading under the section dealing with submission and approval of final *531 plats of a major subdivision. The right of appeal from any and all actions of the planning board being given by the statute, it may not be thus limited by the local legislation.
In summary, the broad scheme of the local ordinance, implementing and within the authority of the enabling act, is that all proposed subdivisions must preliminarily be passed upon by the planning board to determine whether they are exempt from further "approval" or not, i.e., in the nomenclature of the ordinance, "major" or "minor." This is determined not alone on the basis that only four or less proposed lots are involved and that no new street or the extension of any municipal facility is concerned, but also on whether the subdivision, or any aspect or consequence of it, would adversely affect any remainder of the applicant's property or adjoining property or would be in conflict with any provision or portion of the master plan or official map (if there are such) or the zoning or subdivision ordinances. All of these criteria have to be found to be met before the board can classify as "minor," i.e., exempt from further "approval" and the other requirements and procedures involved where such further "approval" by the governing body is necessary. If the criteria are not met, the subdivision is a "major" one, i.e., not exempt, and the converse prevails. The distinction soundly appears to be on the basis that, in most instances at least, a proposed subdivision, even one of four lots or less not involving any new street, which, however, does not meet the other criteria on its face, could ultimately meet them through the installation of various improvements required as a part and a condition of the further "approval" procedure. In addition, if a subdivision, even one of four lots or less not involving a new street, or some of the lots in it, is not "adaptable" or "suitable" for building purposes, "without damage to health or peril from flood, fire, erosion or other menace" or by reason of "rock formations, adverse soil, flood conditions or similar circumstances," and could not be made "suitable" by any such improvements, the planning board may "disapprove" it all together, i.e., either as a "major" or "minor." A classification *532 as either "major" or "minor" necessarily includes a board finding of basic adaptability or suitability, and therefore of "approval" in that important sense and at the board level. Furthermore it seems clear that a planning board, even a "weak" one as in Ramsey, makes all of these preliminary determinations finally and not merely by way of referral to the governing body. If the subdivision is put in the "minor" classification, the only thing further required is the ministerial certification by the mayor and borough clerk on the plat as a prerequisite to filing with the county recording officer. If the classification is "major" and the applicant contends it should have been "minor" or if the application is disapproved entirely, section 19 of the statute gives a right of administrative appeal, with full hearing, to the governing body. Similarly, such right of appeal would exist, for example, where an interested party other than the applicant, such as a neighbor, felt aggrieved where the board failed to disapprove an application or where a subdivision was classed as "minor" instead of "major."
We express no opinion on the matter of necessity of a hearing on notice to all interested parties (N.J.S.A. 40:55-1.7) by the planning board on applications for classification or on the authority for and propriety of the ordinance provisions permitting action on classification applications by the "subdivision committee" of the board and related questions. Nor have we considered the construction of the rather ambiguous provisions of the first paragraph of N.J.S.A. 40:55-1.15, there appearing to be no empowering provision in this ordinance which would bring the paragraph into operation. None of these matters seems to us to be directly involved in this appeal.
The land in question is an irregularly shaped parcel of approximately two acres located on the westerly side of North Central Avenue in Ramsey, with a frontage of slightly over 200 feet and an average depth of about 240 feet. A short dead-end road called Warren Street, running off Elbert Street (which is roughly parallel to North Central Avenue to the west), terminates at the back line of the property. In 1952 *533 it was owned by Ramsey Development Corporation, which also owned the abutting land to the rear around Warren Street. In that year the corporation gave an easement to the borough for a storm sewer drain running from Elbert Street down the middle of Warren Street and ending in the westerly part of the subject tract, "including the right to use of such premises of the Grantor as may be necessary for the construction and maintenance of said drain, said drain to at all times be within the limit of Warren Street and its extension easterly." Our land was then essentially a low, wet area, considerably below the grade of North Central Avenue, and was referred to as a swamp in the easement. Plaintiffs purchased the tract, subject to the easement, early in 1955 and later in that year and in the early part of 1956 filled in the lot roughly to the level of North Central Avenue and to a depth of approximately 200 feet, leaving the back 40 feet, including the outlet of the drain pipe and the area surrounding it, at the same former low level. This in effect created a gully about 40 feet wide along the full extent of the back line of the property. It is also said that the fill caused a low pit-like area to be formed along North Central Avenue near the northeasterly corner, partly on plaintiffs' property and partly on the adjacent land to the north, which had no outlet.
Prior to the fill, the surface waters flowing out of the drain pipe apparently dispersed naturally over a considerable area of the tract, and most of it undoubtedly seeping into the ground. Some of it may have flowed by gravity, although the grade was almost level, southerly through the property, across that of adjoining owners, ultimately finding its way to a small brook some distance south. The fill prevented this dispersal and absorption over the entire tract and surface waters coming out of the drain would either have to seep into the ground within the 40 foot gully or would have to flow southerly through it on to and across neighboring properties and eventually reach the brook. The testimony was not clear as to what had actually happened to this drainage since the fill because what actual observation there had been by witnesses *534 was apparently during a dry spell and the testimony was inclined to be of a conjectural rather than a visual nature.
Some time after the fill was completed, and probably about the middle of 1956, plaintiffs applied to the planning board for approval of a subdivision of their land into four building lots. The record of this application is not before us, so we do not know exactly what was sought. In any event, we are told the planning board classified it as "major" and apparently approved it, conditional upon plaintiffs' constructing a pipe from the end of the drain southerly across their land and through the property of the adjoining owners to the brook to carry the storm waters to that point. We are not called upon to pass upon the power of the board to impose such a requirement. No appeal appears to have been taken. There must have also been at some time some further requirement for drainage improvement, since one of the plaintiffs testified he had expended considerable monies as required by the borough to clean out this brook to aid the passage of water through it, even though it was not on his land.
Plaintiffs decided that the installation of the required pipe was too costly, so they applied again under date of December 14, 1956, on the municipality's printed form entitled "Application for Classification of a Sketch Subdivision Plat," showing a proposed division into two lots for purposes of sale. They obviously sought approval as a minor subdivision without any conditions for improvements. (No question has been raised as to the right to reapply and thereby attempt to avoid conditions earlier imposed; there would seem to be no difference as far as the drainage easement was concerned whether there were two or four lots.) Apparently there was considerable delay by the planning board in acting thereon. There is nothing in the record before us to indicate that a hearing was held, although the briefs intimate there was, or if so, what, if any, notice was given, what kind of a hearing it was or what proofs or contentions were presented by the applicants or anyone else. We are not furnished, nor was the court below, with any minutes of the board. The chairman of the planning board testified it engaged a *535 civil engineer to make an investigation and report, and acted largely on the strength of the report, although it is not before us. This was the only evidence relating in any way to how or on what basis the board acted. There is no indication as to whether the matter was considered by the subdivision committee, and, if so, how and with what result. The only thing before us, and before the trial judge, is a resolution of the board adopted May 7, 1957 classifying the subdivision as major and disapproving it.
The resolution classified the subdivision as "major" and then "disapproved" it for specified reasons: (1) "it" would involve the extension of the storm drain from Warren Street, a municipal facility; (2) "it" would interfere with the drain and the borough's drainage rights; (3) the premises are filled in such a manner as to interfere with the drainage rights; and (4) the premises "were and are in a low swamp area unsuitable in their present condition for development purposes and sanitary facilities." The first three reasons seem to imply that the drainage conditions were subject to correction by an improvement which might be imposed through the medium of tentative and final approval by the governing body, i.e., by piping across the property and beyond, from the drain outlet to the brook, as had been specified on the prior application. The last might be said to relate to unsuitability for building purposes under any circumstances. Disapproval at the initial stage appears inconsistent with simultaneous classification as a "major" subdivision, in the light of the analysis and construction we have previously outlined, if the board was using the term in the sense just mentioned. It is equally possible, however, that it only intended disapproval as a minor subdivision as contrasted with a major one. Considered from that standpoint the resolution indicated only the conclusion that the property did not meet the criteria for classification as an exempt subdivision despite the number of lots and the fact that no new streets were involved, and carried no further connotation than a "major" classification requiring further proceedings for ultimate approval. But more important, *536 there is very little indication of how or on the basis of what proofs or other evidence these findings were arrived at.
On April 20, 1957, prior to the adoption of the resolution, this suit was instituted. The complaint alleged the proposed subdivision was "in all respects in accordance with the law and the plaintiffs are entitled to an immediate approval thereof by defendants who have failed, refused and neglected to act thereon." The mayor and council were joined as defendants apparently on the mistaken assumption that that body had to approve. The demand for judgment was that the defendants "be required to issue an approval of the subdivision of lands hereinabove described."
The basic theory of the complaint was obviously to compel the agency to act, one way or the other. It was essentially in lieu of the prerogative writ of mandamus. Such would certainly be the limit of possible judicial intervention at that stage. Switz v. Middletown Township, 23 N.J. 580, 587 (1957); Kukowski v. Rath, 6 N.J. Misc. 972 (Sup. Ct. 1928). There is nothing in either the statute or the ordinance providing for automatic classification as a minor subdivision in the event of failure of the board to act on an application for classification within any prescribed period of time. The only statutory provision for automatic approval by mere lapse of time relates to the matter of approval of a final plat (N.J.S.A. 40:55-1.18) and cannot be construed to force either of the two classifications possible upon an initial application such as we have here. Indeed the form of application here involved did not even ask for classification as a minor subdivision  it merely asked for classification.
Before answer filed, the planning board did act by the resolution of May 7 above referred to and the answers filed by both the board and the mayor and council set up this action by way of defenses to the suit. The governing body also filed a counterclaim in which it alleged that the filling of the property by plaintiffs interfered with the right of the borough to drain surface waters over the premises as granted by the easement, and sought to compel plaintiffs to remove *537 the fill and to enjoin them from interfering in any manner with the use of the premises for such drainage rights. An answer to the counterclaim was filed denying that plaintiffs had interfered with the easement, but they filed no reply in avoidance of the separate defenses of the answers.
The case thereby became moot, as far as the allegations of the complaint and any justifiable demand for relief thereon were concerned. But no one took any further action and, with the pleadings in that posture, the matter came on for pretrial some four months later. The case must have been presented to the pretrial judge as one, at that stage, in lieu of certiorari to review the action of the planning board in disapproving the application and classifying it as a major subdivision, as well as for injunctive relief on the counterclaim, since paragraph 1 of the pretrial order so states. The paragraphs of the order dealing with the contentions of the parties simply deny on the plaintiffs' part and affirm on the defendants' part, as matters of fact, the reasons advanced in the planning board resolution. No contention was advanced by either side that the action of the board was or was not arbitrary, capricious or otherwise unlawful. No mention is made of the record before the board.
The necessity to amend the pleadings appears to have been recognized, since paragraph 6 of the pretrial order reads, somewhat ambiguously, as follows:
"6. Leave is granted to plf to supplement their complaint by the addition of another count bringing up for review the legality of the land subdivision ordinance of the Borough and also amending his complaint praying for relief and for judicial granting or ordering the subdivision whether it be called major or minor. These amendments being substantial will be pleaded formally by the plf and served upon the defts within 10 days and the defts are granted 20 days in which to file answer."
Nonetheless the order set the case down for trial in the weekly call of the day following the conference.
It is perfectly obvious that, in view of the state of the pleadings, the case, on the theory of an action in lieu of *538 certiorari, was not ready for pretrial at the time the conference was scheduled. It is also apparent that, since formal pleading amendments were directed, even though their extent or purpose is not clear from the order, a further pretrial conference should have been provided for to put the matter in proper shape for trial.
The order did go on to specify the issues, inter alia, as the legality of the planning board action disapproving the application, whether the plaintiffs were entitled to approval of the subdivision and whether the subdivision is a major or minor one, as well as the issues raised by the counterclaim.
From all that appears in the appendix, the formal pleading amendments called for by the pretrial order were never filed, and the case came on for trial on the original pleadings and pretrial order 35 days after the pretrial conference before a different judge. The case was tried completely de novo, practically as if the matter had never been before the board. Full testimony, mostly of a purportedly expert nature, was offered by both sides on the drainage situation, interference with the borough's easement and the suitability of the land for building purposes. (This testimony was, to some extent, pertinent to the counterclaim.)
Although counsel in their summations touched slightly on the question of whether the planning board had acted arbitrarily, the lower court in his oral conclusion treated the situation just as if he were sitting as the planning board in the first instance, rather than merely reviewing its action under the established principles of judicial review of the acts of administrative agencies. He found as a fact that this was a minor and not a major subdivision and did not involve the extension of any municipal facility, that there was no interference with the borough easement, and that the low area at the northeast corner, even if plaintiffs could be held responsible for it, was not of such moment as to constitute a menace to health with respect to the use of the property for residential purposes. He directed the entry of a judgment that the resolution of the planning board be set aside, that the application for a minor subdivision be approved, *539 and that the mayor and council approve it. The counterclaim was dismissed, on the ground, as recited in the judgment, that the plaintiffs had not interfered with the rights given the borough by the easement. The original briefs filed with us were in the same vein as the trial below, approaching the case primarily as if it involved an appeal from a judgment in an ordinary non-jury trial involving questions of fact.
Apparently no one during the whole course of the proceedings adverted to the provision for an administrative appeal to the governing body by any party aggrieved by action of a planning board as specified in N.J.S.A. 40:55-1.19. This inadvertence may well have been brought about by the fact that the suit was started before the board acted. At the oral argument before us, we raised the question whether plaintiffs were not required to exhaust this administrative remedy before seeking relief in the courts, and also whether any such relief was not limited to a review of the action of the planning board based on the record before the agency as distinct from a full trial de novo. We directed the filing of supplemental briefs by both sides on these questions, which have been received and considered.
It is fundamental in our law that judicial proceedings in lieu of prerogative writ shall not be maintainable so long as there is available administrative review to an administrative agency or tribunal which has not been exhausted, except where it is manifest that the interests of justice require otherwise. R.R. 4:88-14. Jorgensen v. Pennsylvania R.R. Co., 25 N.J. 541, 556 (1958), in which will be found a thorough analysis by Justice Proctor; Deaney v. Linen Thread Co., 19 N.J. 578 (1955). As the cited rule states, the principle is not an absolute one and will not be applied to dismiss an action in certain instances  among others, where the disposition of the matter depends wholly on a question of law or where the administrative remedy is futile, illusory or vain. Honigfeld v. Byrnes, 14 N.J. 600 (1954); Swede v. City of Clifton, 22 N.J. 303, 315 (1956); Jorgensen v. Pennsylvania R.R. Co., supra *540 (25 N.J. at page 558). But it should and will be adhered to, where, as Justice Heher said in Swede, there is involved "an issue essentially administrative involving agency expertness and discretion, in its nature peculiarly administrative rather than judicial." (22 N.J. at page 315). That is, so to speak, the situation here. The question of the suitability of the filled land for building development and the handling of the drainage problems are essentially fact questions much better adapted for determination by the local agencies designated by the Legislature for that purpose than by the courts. The exhaustion principle is not simply a technical one; it is founded on the sound policy that the judicial branch should exercise due restraint in interfering in the administrative field, where the Legislature has committed the matter for determination by an agency and prescribed the course to be followed therein, unless and until that course has been completed, and then only to the extent of the well recognized principles of the scope of judicial review.
In this connection, we see no merit to defendants' additional argument that, in the instant case, plaintiffs should have no right to maintain an action for judicial review of the planning board's determination until after tentative and final approval as a major subdivision. To require such additional proceedings first seems not only unnecessary but unjust and an undue burden. Good sense dictates that an appeal to the governing body followed by court action, if desired, should be possible after the board's initial finding on classification. N.J.S.A. 40:55-1.19 clearly allows such; in fact this would seem to be one of its most effective and salutary purposes.
It is basic that the scope of judicial review of acts of an administrative agency in a quasi-judicial capacity is narrowly limited to an examination and determination of whether it acted arbitrarily, capriciously or otherwise illegally and to a correction of any abuse of the discretion legislatively delegated to it. Tomko v. Vissers, 21 N.J. 226, 241 (1956). We are of the opinion that, generally speaking, a planning board passing on an application for subdivision classification *541 (i.e., exemption), and the governing body on an administrative appeal therefrom under N.J.S.A. 40:55-1.19, are acting in a quasi-judicial capacity, in the same way as are a board of adjustment and a governing body in zoning matters under R.S. 40:55-39, as amended. Very substantial interests of the applicant and other property owners in the area may be involved on such an initial application, as well as the public interest in seeing that the purposes and benefits of planning, from the broad standpoint as well as that specifically expressed in state and local legislation, are properly regarded and effectuated. We feel the same principles governing review should be applicable as have been held controlling under R.S. 40:55-39, so well outlined in the Tomko case. So, the actual "trial" of the matter takes place before the local bodies under the statutory scheme. The administrative determination must be grounded in competent and credible proofs and represented by appropriate findings based thereon. Fundamental requirements of administrative due process and fair play must be met. Since we do not know what actually transpired at the local level in the case at bar and no question relating to due process has been raised, we express no opinion, as we have previously said, on whether notice and hearing before the board on an application for classification is necessary. The statute is not specific (see N.J.S.A. 40:55-1.7 and 1.15, first paragraph), as it is in the case of matters before a board of adjustment (R.S. 40:55-42 and 44, as amended); also note the provision for a hearing on notice on appeals to the governing body. N.J.S.A. 40:55-1.19. We also realize that, from a practical standpoint, there are many classification applications which present no real problem, are without question either exempt or non-exempt, and do not involve any substantial private or public interests requiring great consideration at that stage, but since the public, and especially the affected neighbors, might wish to be heard, it would seem to be prudent to give notice before classifying a subdivision as a minor one, for that in effect is the final approval of the subdivision. Even though notice may not *542 be absolutely necessary, it is always commendable in the transaction of public business when it is given, and in the long run it may save not only friction and appeals, but time and expense.
Judicial review, being of the validity of the agency action, and not by way of substitution of judgment for that of the agency, can only be had on the record below and not by a trial de novo in the court. Tomko v. Vissers, supra. The necessity for properly making that record and presenting it in appropriate form on judicial review is present to the same extent as in the case of review of agency proceedings under R.S. 40:55-39 and the comments of the Supreme Court thereon are equally pertinent. Dolan v. DeCapua, 16 N.J. 599, 611 (1954); Tomko v. Vissers, supra. In the instant case, there was no such record before the trial court. As we have indicated, we have no idea what went on before the board and neither did the trial judge; all he had was the board resolution. We repeat that a complete trial de novo was conducted. Even though neither party objected and the question was not raised until we posed it at the oral argument, such a trial was quite improper (Tomko v. Vissers, supra, 21 N.J. at page 241), except insofar as the evidence bore on the counterclaim issues. Dolan v. DeCapua, supra (16 N.J. at page 613). In passing, we may comment that the testimony introduced in the Law Division cannot, by any stretch of the imagination, be said to amount only to a mere "settling" of the evidence actually received by the board. Dolan v. DeCapua, supra (16 N.J. at page 609); Beirn v. Morris, 14 N.J. 529, 538 (1954). Nor, as plaintiffs also suggest, can any support for the trial procedure followed be found in Bierce v. Gross, 47 N.J. Super. 148 (App. Div. 1957) or Wharton Sand & Stone Co. v. Township of Montville, 39 N.J. Super. 278 (App. Div. 1956). In the former, this court at the time of oral argument simply asked that it be furnished with copies of pertinent official maps showing the area of the municipality involved. In the latter, an unusual situation involving a peculiar ordinance provision, all local administrative procedures *543 had been exhausted and the governing body had given no reasons for its action in denying the property owner the exception sought.
Ordinarily, when it becomes apparent to a trial court, at pretrial or trial, that the agency record before it is inadequate or that the proofs to ground an agency's findings and conclusions are not sufficiently shown in the record or when it appears that the findings and conclusions have been based, even in part, on facts or matters which were not introduced or made known to the parties in the proceedings below, the proper practice is to remand the matter to the agency for a rehearing and redetermination. Dolan v. DeCapua, supra (16 N.J. at page 610). That normally should have been the result in this case at the trial level, and even would be now by action of this court, were it not for the failure of plaintiffs to have exhausted their administrative appeal before seeking judicial review. As we have said, that principle is peculiarly applicable here and it is too basic and important for us to overlook it, even though not raised by the parties. It requires a reversal of the judgment on the main case with a direction to dismiss the complaint. Jorgensen v. Pennsylvania R.R. Co., supra (25 N.J. at page 562).
But we do feel that, under all the circumstances, justice dictates such action should be without prejudice to the institution by plaintiffs of new proceedings before the planning board. The large number of procedural errors and inadequacies, not all of which can be laid at plaintiff's door, the novelty of the problems presented in the field of administrative procedures under the Planning Act, the absence of prior judicial interpretation thereof and other similar circumstances lead to this result. It is in accord with that reached in Tomko, a case involving, in many respects, a similar situation (21 N.J. at page 241), and it is so ordered.
Consequently, we find no occasion to express an opinion on the merits of plaintiffs' application or the board's findings and determination thereon, other than to refer to the language *544 of the Supreme Court on the general subject of drainage in relation to planning, found in Ardolino v. Florham Park Board of Adjustment, 24 N.J. 94, 108 (1957):
"The problems of drainage that have arisen as a result of the extensive land development of the past decade are far too serious to be passed over lightly. It was not until poor planning and this wholesale development of land caught many communities unaware and without adequate power, means or foresight to compel developers to provide for necessary drainage that the true aspects of the drainage problem became known. Instances were not uncommon where because of poor drainage septic tanks were rendered ineffective and their effluent caused to flow into open surface drainage brooks to the great detriment of the communities concerned. By the Municipal Planning Act of 1953, L. 1953, c. 433, N.J.S.A. 40:55-1.1 et seq., the planning boards were expressly given the power to compel adequate drainage on lands to be subdivided or resubdivided for sale or building development, with a view toward alleviating some of the existing bad conditions and avoiding the creation of new problems in drainage."
We are convinced, however, that the lower court properly dismissed the counterclaim for injunctive relief against interference by plaintiffs with the drainage easement rights. The claim for such relief was not asserted until more than a year after the fill was completed and the alleged condition created. There was no substantial proof that there had yet been any actual interference with the drainage rights or other damage to the borough's interest. Any testimony in support of the claim really related only to future possibilities. "Injunctive judgments are not granted in absence of clear and convincing proof." Dolan v. DeCapua, supra (16 N.J. at page 614). Such future possibilities, however, would be highly pertinent matters for a planning board to consider on matters within its jurisdiction. Ardolino v. Florham Park Board of Adjustment, supra. The judgment dismissing the counterclaim is affirmed.
No costs on the appeal to either party.